All right, Mr. Rice, I see you have two minutes reserved for rebuttal, so you can proceed whenever you're ready. Thank you, Your Honor, and may it please the Court. I want to focus my argument this afternoon on what I believe to be the three clear errors the trial court made in dismissing our first count, the anticipatory repudiation count, and the one significant error the trial court made in dismissing our breach of contract claim. In going to the first, in dismissing the anticipatory repudiation claim, the trial court relied on the Prince's Point case with the position that filing of a complaint in and of itself does not constitute an anticipatory repudiation. That is not what that case says. That case held in the facts of that case where the complaint didn't seek the repudiation of the contract. It only sought the repudiation of an amendment to the contract. That, in that case, it didn't constitute an anticipatory repudiation. So we don't have some case law that the district court— Doesn't the case say that so long as the plaintiff in this declaratory judgment-type situation is not indicating that this is our position and we're sticking to it no matter what, but instead seeks clarification from a court as to what its obligations are. And if the court says that the plaintiff is right and the contract was obtained by fraud or whatever, you don't have to comply. But if the court denies it, then they indicate they're going to comply. So why is filing that lawsuit an unambiguous indication that they are denouncing their obligations under the contract and refusing to comply? Because the reason is that what the case does not say is that the filing of a complaint alone therefore doesn't constitute repudiation. But when you take the filing of the complaint—this goes to the second point— with all the other facts that were before the court, the letters to the town, the letters submitted to us— Well, that's another thing. What we're looking for is what are the indicia that would lead the district court here to conclude that there was an anticipatory repudiation. And if you're saying in the totality of the circumstances, then perhaps this filing of the lawsuit gets some weight. But I think—doesn't the case pretty clearly say that it would have to be the totality of the circumstances, that filing that action alone isn't enough? I agree with that. As I read the district court's opinion, she starts out by saying, dismissing under the Princess case just the filing of the case alone, when I think Princess doesn't say that. And it does say we should look to the totality of the circumstances, which I don't believe the court did. Do you agree that somebody can say—could file a complaint and say, I think this contract was fraudulently induced, and therefore I think it should be invalidated. But if the court upholds it, I'm prepared to comply with my obligations under the contract. And that would not be repudiation of the contract. That would just be pursuing their claim. So do you think that St. Christopher's here was not filing it in good faith? They didn't really believe in the claim? They were just trying to delay performance? Or you think that filing that claim itself is repudiation? Or filing that claim only in connection with some other activity is repudiation? I think two things. One, filing the complaint with the other facts. But secondly, filing the complaint based on a theory about the contract that literally had no basis as a matter of fact, that was completely indefensible. Well, it could be a bad—it could be a frivolous claim. And if it is, I suppose that goes into the hopper with all the facts. But I thought you were arguing that the filing of the lawsuit is an anticipatory repudiation. And I read the district court as saying, no, it isn't, at least not in and of itself. Right. I read the district court as kind of dismissing the filing of the complaint under Prince's case. And I am saying that the filing of the complaint in conjunction with the additional facts— Okay, so let's hear about the additional facts. It sounds like we're on more or less common ground here. Right. So here's what I think is significant. We not only have an addition to the complaint. We have the letters submitted to the town. We have the letters submitted to my client. We have a threat, which the trial court doesn't consider, as they're going to sell it to an environmental company. We have the publicity. And then all of this is based on what I believe is an untenable interpretation of the contract. It's all based on this claim that the original contract somehow provided for low density and that the amendment somehow snuck in a provision that allowed high density. Isn't that the question? Isn't that the question? St. Christopher says that they understood it to only be about low density, and they wouldn't have agreed to it if they understood that it was going to be a high-density facility. And so that's the question that they're trying to get decided. Right. But it's untenable because the clear reading of the document, the first concept, which I think you're going to lose on your claim. The key on the New York law, it's whether they indicated through an act or something they said, a positive, unequivocal intention to abandon the contract. They could have done everything that you just described to defend their interests and their view of the contract, but ultimately, as they said when they filed this lawsuit, if the court rules against, you know, we just want a declaration of our rights under this contract, but we're not going to breach. We're going to go forward. We're going to comply, and you want us to ignore that. Once they base it, and I think that's important. I want to certainly get this piece on the record. The original agreement has no limitation about how many units can be built. Right, but isn't their claim fraud in the inducement? They're not talking about that the contract is being misinterpreted or misconstrued. No, but as I see it, they claim that they got hoodwinked in the amendment. At the second stage. At the second stage. The second stage. So there's no allegation here in their lawsuit that they were presented with sort of drawings or plans or something that looks like a 35 unit. No, but between the first and the amendment, everything that we submitted to the municipality, according to the municipal records, was looking for units of 150 units or 200 units. Right, but what was told to them in the negotiations? But the point is in the first agreement when they were represented by counsel, the only limitation in the agreement was if there was less than 35 units, my client could get out of the deal.  I understand that. I'm asking the question. Is there any allegation by them that they were told that your plan was to do something that was low density? No. I've seen the argument which says that that's what they thought. But I don't see this argument that that's what was being represented. Well, they said they had been misled and they thought it was going to be a low density facility and they would never have agreed to it if it was high density, right? And the original contract says no less than 35 units. That's a low number, right? That would have been a low density facility. But it's only on the opposite end. All it's saying is under the first agreement, if the town came back and said to my client, we're only giving you 30 units, my client walks away. Under the amendment, he can't walk away. No matter what the town does, he can't walk away. And under the second amendment, there's a provision that says we will now give you not just development, we will give you conservation. That's what the plaintiff wanted. The plaintiff got a better deal the second time than he did on the first time around. But yet in our view, we got a better deal in that respect. But if, in fact, you thought that it was important to St. Christopher's to have a low density facility, then it didn't necessarily because it's more clear that there's going to be a high density facility. First of all, I'm not sure. I think that's a different question, which is about the breach of the covenant of good faith and fair dealing. So if we think that St. Christopher's reaching out to the town and so on hampered your ability to get the relevant approvals, what is the remedy for that? Well, that was the question in terms about the elections. Do we have purely a breach of contract claim or can we specifically? Right, so I guess that's my question. So what are you asking for on that? Do you think that that means you should be excused from having to get the approvals by a certain date or you think that that is a breach, which is, I guess, the way we might normally think about it? Our argument on the breach, and I'm glad Your Honor brought this up because I think this is very important. Once they filed the lawsuit and made the allegation and in their letters to the town and said to the town, we don't believe there's a valid contract, right? There was no way my client could go forward on an application. The only parties that can apply for town approval are either the owner of the property or a contract purchaser, right? And once it was put into question. But you are a contract purchaser, right? Yeah, but not according to the plaintiff. And no zoning board is going to consider that case until that was resolved. This is what the district court was focused on, which is she said there's nothing to indicate that anything St. Christopher's did prevented you from getting the approval. So why do you think we can infer that that intervention prevented you from getting the approval? Because St. Christopher's filed the lawsuit, wrote to the town, telling them we do not believe there is a valid contract. There was no way we could go forward until that issue was resolved. So what in the record? I mean, I guess it's not the record. I guess it's a complaint. So what in the complaint do we look at where we know that you could not have gotten the approval as long as the lawsuit was filed? Because what we put in the counterclaim that we said was specifically that before they filed a complaint and because they had told the town that this was an invalid contract and they were deceived. All right. That precluded there was no chance, no possibility whatsoever that there could ever be a hearing while that cloud existed. And for us that don't expend money on experts and consultants. So, Mr. Rice. Excuse me, Mr. Rice. I want to go back to Judge Menasci's original question because I'm sympathetic to your argument that it's a reasonable inference that in an exurban community that might not be that enthusiastic about a high-density development in the first place. When the seller of the property is saying, this is a terrible high-density project that we never signed off on and we're not even going to sell the land to them. And we're going to go to the newspapers and we've already gone to the town board to complain about these people, that that doesn't make it easier for you to get any approval to say the least. But Judge Menasci's original question is, so what are you asking for in damages? Lost profits? If the argument is they did these things and it subverted the contract, well then if you're saying, okay, so we get to walk away now free of loss. That's already happened. If you're asking for money, what is the money that you think you're entitled to get from them for the breach of the covenant of good faith? Without prejudicing all of the potential damages I could think of, we have a deposit that was made. We retained experts from the beginning to do all the due diligence that occurred during that due diligence period. We expended those monies. We obviously expended money on council because we did file the initial application with the township. We know from the records that there were meetings. We had asked for 200 units and the town board- So you're asking- We're out of pocket a lot of money. Excuse me, Mr. Wright. So you're asking essentially for the costs that you incurred pursuing the contract that you say they subverted and made impossible to succeed on. Is that it? I think that's true. One of the reasons why we never actually made the election, which plaintiff acknowledges we didn't make, is because we would have to make a judgment at some point. If we get this contract in force, can we be successful in light of all the things that the plaintiff has done to damage us and damage our reputation? Which was an ongoing issue from the time they first filed the complaint until they- We had more publicity. Successful at what? If ultimately it was a determination that this still is a valid contract, we would have to decide. We would have to make the decision. Can we get the approvals? Has our reputation been so damaged- Right, but isn't this why the breach of the covenant of good faith and fair dealing is a different claim than the claim of anticipatory repudiation? Excuse me, because their argument is, and you can tell me what's wrong with it, that you had- When all these other things are happening, including this interference, all this stuff is going on, you have two choices, it seems to me. You can go forward and hope that the cloud will pass and you'll be able to go through with your project. Or you can say, in effect, the hell with these guys. They've basically made this impossible right now. This all amounts to anticipatory repudiation and you act then or within a reasonable time. But instead you don't act until after you've already much later failed to get an extension and you make a decision and you're already in litigation with them and everything else. This is pretty late in the day. I would say two things. Number one, how long is reasonable to me is, A, maybe it's a jury question, it's a fact-intensive question. And because of what happened, from the filing of this original complaint to the additional publicity that occurred subsequent to the filing of the complaint, and then the filing of an amended complaint, we had a right to look at all that stuff before we made the elections. Do you have any cases where a period of over a year – just over a year, so we'll call it a year – was held to be a reasonable time to make this election? No, and what I see from the recollection is there really is not a lot of cases that are on point. I want to make one last point. I know my time is up. Well, let's not have an argument about whether you had to perform under the contract. I guess your argument is you didn't need to make an election because there was nothing you were required to do under the contract yet. Is that your argument? Well – The next thing you had to do was get the approvals, right? Right. And you didn't get the approvals, so should we understand that as an election to treat the St. Christopher's as having breached? No, because ultimately – because we were prevented from getting these approvals, we certainly would have had the option if ultimately the contract was upheld to – if we chose to make those applications. So you didn't actually treat it as breached? Well, we just – we haven't specifically made the election. But I just want to point one last point because I know I can't do it on rebuttal. And I think the court needs to keep in mind that for one year from the filing of the original complaint in March of 2017 until March of 2018, it was the position of the plaintiff that this was an invalid contract. It was procured by fraud. It should be voided. And then in March of 2018, they say, oh, everything we said were taken back. Now we're going to argue for the very first time that it's a valid contract. You make arguments in the alternative in this litigation. You say it's either – it's a valid contract and we want specific performance or it's breached and we want damages. I mean they can say we don't think the contract is valid, but even if it is, we're exercising our termination rights. That's not an incoherent thing to do. Why I think it's different. I think we were correct in our pleadings to argue in the alternative. I think that's permitted. That's not what the plaintiff did. The plaintiff didn't argue in the alternative in the first case's complaint. It took the position for one full year that the contract was void or procured by fraud. And then and only then after we were dealing with that did they change their mind completely in March of 2018 because the 24 months had expired. That, and as we cited in our brief, I think is completely different. I think that is more. All right. And I just want to bring that to the court. Thank you, Mr. Rice. Thank you. Mr. Scherer, you're up. If it pleases the court, my name is William Scherer. I'm a member of Wilk Auslander LLP. We represent St. Christopher's. This is one of those cases where the court is writing an opinion saying it is black-letter law or maybe it is hornbook law. Because I believe that between the Lucente case from this court long before Prince's Point and the Prince's Point case, both set a proposition. You have to make an election. At this point, this is now four years after the lawsuit was started. They still have not made an election. Anticipatory repudiation is like a fish will cut bait proposition. If you're going to fish, you keep trying to catch fish. And if you're going to cut bait, you stop fishing and you blame the other guy because he's keeping the fish away. Well, the next thing they had to do under the contract after what they say is an anticipatory breach was get the approvals, right? The approvals had to be done under the contract. And they didn't get the approvals. They didn't get the approvals. So actually they didn't perform under the contract after the event that they say was anticipatory breach by your client. So why isn't that enough? Well, it certainly is enough to – To terminate. I know that. To dismiss the termination. That's a different argument. I'm asking you about the anticipatory breach claim. The anticipatory breach because they – I believe that the election has to be an unequivocal election. That's what the cases say, unequivocal. And you think it has to happen in a certain amount of time? Like can they make an election now if your position is to make an election? I think at some point you can't sit on the fence. So when does that time come? Well, that time certainly happened when they filed an appeal. That's long past. But that's not what we're talking about here, right? We're talking about a reasonable time. And we're talking about did they, during what was a reasonable time, act as if they were not treating you as having breached but they were still trying to get the approvals? They did. And, in fact, they told the court that they were continuing to pursue the approvals. Okay, so that's – those are allegations and they're concessions by them is what you're saying. Correct. That, yes, you would be excused from the contract absent the payment of an extension fee if they failed. But it's not that they breached the contract somehow if they don't get the approvals. That's not what they have to do to comply with their obligations. But they have an obligation of good faith and fair dealing too. Correct. If they stop trying to get the approvals, that would be one thing to do. And that would otherwise be a breach unless they could blame you for an anticipatory repudiation. Correct. This is what you're trying to do. But your position is they did not choose to treat it that way and throw up their hands and say we're never going to get the approvals now because you've done something that is so drastic that it's an anticipatory repudiation. Instead, they said, in court at least, that they were continuing to try to get the approvals, which is inconsistent with treating what you did. Is that your position? That's essentially the position. In their counterclaim, they allege that even after the client pressured, according to them, JMF to withdraw from the contract and initiated the lawsuit, that they sought to move forward with the contract as amended. They could have taken the position that they were pursuing the contract. Right. It wasn't that their silence could have been interpreted two different ways. They have affirmatively stated in their own counterclaim that they, at that point, even after that point, wanted to move forward. And there's a real practical undercard to all this. Let's just pretend for the moment that they had said we're done. Contract's over. We're suing you for damages. I have enough experience in the real estate area to know that that is a virtually impossible claim to establish damages. It's filled with speculation. The only way that they could get anything really tangible and concrete without pouring enormous amounts of money into litigation is to enforce the contract and build the project. They think they're good developers. They're going to make money. If you have to start going about proving— So then what you're saying is that they can't recover on the anticipatory breach claim because they didn't repudiate the contract. But if they had repudiated the contract, it would have been impossible to recover. So there's nothing they could have done. So you could have been doing an anticipatory breach, and there's just no way that they could have recovered for— Because I don't think they could have proven it. The burden of proving damages would have been so high. So what you're saying is they would have lost, and they should lose now on their anticipatory repudiation claim because if they had followed that route, they would have lost because what you did is not really provably an anticipatory repudiation. Right. Is that your point? That is the point. But you just said that even if they did treat it as if it had been breached, they wouldn't have been able to recover anything anyway. They were pushing a stone so far uphill. And none of this has anything to do with your conduct. It doesn't have to do with whether there was an anticipatory breach or not. It's just about whether—about their conduct, whether they treated it as repudiation. And you're saying if they treated it as repudiation and acted as if the contract were over, there's nothing they could have recovered. And if they didn't do that, then there's no way they could pursue the anticipatory breach claim. So you're just saying that you have them over a barrel and they couldn't possibly do anything. I think we do. I think we did, and I think that— I don't think that's a very good argument at all. But the thing that's gotten lost, I think, is that that amendment to the contract, that was clearly slipped through someone. How does that change anything? Why? Because why— The terms of the contract say no less than 35 units. There's no upper limit on the units. Then at the end, what they slip through is they take out the no less than 35, which means, I take it, that if they got an approval that was, as Mr. Rice suggested, limited to 20 units, they would still have to go through with the operation or breach their obligations, right? Which would have—the damages to them would have been very small. Well, whether it would be or wouldn't be, the point is where do you get hornswoggled by the removal of a provision that at least hypothetically works to their disadvantage by imposing a limitation on their obligation? Well, I believe we get hornswoggled because what—contracts get amended presumably for a purpose. If they already had the right under that contractual provision to build without a cap on a number of units— Well, but they did. So why do you think it was inserted? So you're saying that you were tricked by it. So why would they have inserted that if it doesn't— Although it's not a lock-in kind of thing, but that's what's depicted. And then they go to the town, and the first thing they ask for is 200 units and 400 underground garage spaces. It's a lot easier to argue that the contract supported the 200, 400 scenario. So even though it wasn't technically required to have the amendment, you think because the original contract said 35 units, somebody could read that as implying it can't be much more than that, even though the contract didn't say that. And that's why they wanted to— The absence of a ceiling introduces— So why would they need that argument with the town? So I understand that you wrote to the town to say we're surprised by the switch to high density. Did you encourage this? And the town responded by saying, no, they've always planned to have a high-density facility. It's not changed at all from the beginning. So it seems like the town would not have been surprised by that. I wasn't saying that the town was going to be surprised. I was saying that the understanding, we believe, at the time that the contract was executed— So you're saying it's directed toward you having an argument that the facility has to be low density. Can I back up, Mr. Sherry? Can I back up to the—I know it's hard with everybody wearing masks to know who's talking to you. You are saying that there was an exhibit to the original contract that showed a development that planned 35 units. Something like that, yes. Something in that range. Okay. So you don't—you're not relying, it seems to me, on this contractual provision as other than a sort of window dressing. You're saying they also represent—this should be read a certain way because they represented in this drawing to you. And therefore, you were misled. Is that what's going on here? Right, except that we did not pursue that any further when the contract— Got changed. Well, got canceled because they didn't— Okay, got canceled. I understand that. Okay, so fine. Now, but all of this—can you just focus on the good faith and fair dealing? Because I understand that obligation. The obligation is not to undermine the other side's ability to perform the contract. Their allegation is that you did everything you could to—which may not have been much and may not have been effective. That's a causation question, it seems to me, for trial. But as far as what they're saying you did, you did everything in your power to keep them from getting the approvals. Because when you add together the litigation, which puts them in a bad light, the threat at least, and they say on information and belief, there must have been something in the press, whether in fact they can prove that you went to the press. But you threatened to go to the press, and then apparently things show up in the press. They—you write to the people responsible for the zoning and the approval of the project and say you were hornswoggled and this is not the plan that we thought was going to happen, so that even the seller of the property isn't backing this deal anymore. Why isn't that a classic example of doing everything you can to foil their ability to perform? Now, whether it succeeded or whether it would have gone the same way otherwise, as I said, that's a question of causation. But why is—why are you allowed to do that? First place because the letter that we sent to the town is A-586, and what it says is we are about to commence litigation arising from a disagreement between JMF Properties and our client regarding the size of the proposed project. Although neither the town nor its departments yield will be named as defendants, I anticipate town officials, most especially you, will be asked to give depositions and testify should there be a trial. It is entirely possible that most, if not all, of this involvement can be avoided. The original signed contract between St. Christopher's and JFM envisioned a low-density, multifamily residential development. The number 35 was used in the original contract, and that included the affordable housing component. Mr. Forgione has advised us that you initiated the change that took place, resulting in the current proposal for high-density, multifamily residential development. You were, of course, free to initiate such a proposal, and our client would have no basis for objecting to your doing so. If there was a deposition or trial, a central question will involve the identification of who initiated the proposal. If it was you, then so be it. If, in fact, it was Mr. Forgione, then I am sure he would be happy to have his recollection corrected. A great deal of time, energy, and legal expense can be avoided if you can advise you what actually happened. This situation has become time-sensitive. I assume you would like to have the town's attorney involved. Conversations shouldn't take more than a few minutes. Yeah, and I'm saying if I get that letter, I'm thinking, oh boy, this is a huge can of worms. The real easy thing to do is to deny this application in the first place and get the heck out of here before this becomes an election issue. But that didn't happen. I know that didn't happen, but they never got their approvals. They never really pursued their approvals. They dropped it. If they never really pursued it, then they didn't make an election. You're saying on the one hand they pursued it all along. No, no. I said that they said they were going to continue to pursue it. They told the court they were continuing to pursue it. They were going to go and seek their approvals. They never sought their approvals. They don't know they wouldn't have gotten their approvals. They needed zone change. But why isn't it plausible that you write to the town and you say we're going to be in a litigation. We thought it was going to be 35, and now it's high density. The town writes back and says, whoa, you're going to – somebody is implicating us in responsibility for this high density facility that even St. Christopher's now opposes. And it says, I wish to correct – it's the next page. I wish to correct the writer by saying in unequivocal terms that the town – that that was never the proposal. The town never encouraged this. They don't want to be blamed for it. Why isn't it a plausible inference that they're being intimidated and they're being drawn into a litigation and a controversy and therefore wouldn't give the approvals? Well, I had to do my due diligence, and part of my due diligence was to sign a complaint when I had investigated the facts, and that's why I wrote these letters. So maybe that's right. Maybe this is part of due diligence, but why isn't it plausible that if you're leading this campaign and trying to stop the development from happening, that that could be responsible for the town not giving the approvals? I mean you never said to the town something like, of course, the approval process should continue in the ordinary course. I'm just doing my due diligence. We never told the town what they had to do. In fact, the town was preparing a comprehensive plan at the time, and the comprehensive plan, which came well after this, denominated that particular development as one of the developments in the planning process before the town. The argument that they're making is that a jury could reasonably infer on the issue of causation that there's no way it would have gone through with those types of letters. Whatever your reason was, that's a different issue on causation. The district court said there's no causation under the prevention doctrine. Why isn't there a reasonable inference that could be drawn that there's no way the town is going to do it with letters like that? That's the bottom line. I disagree because this is the kind of stuff that goes on in suburban municipalities.  And it goes on forever and ever. You can't draw a conclusion. The only statement that we made was that the developer told us the town wanted to have a bigger development, and that's the only reason. And that suggests – I mean it suggests that you're saying I did this in good faith, but that's a factual question as to what was going on here, right? What they're saying is once you decided for whatever reason – and when I say you, I mean your clients – that you were surprised by the bigger development or you maybe shouldn't have been or whatever, that you got disenchanted with the deal, that then you turned around and tried to torpedo the deal. That's their allegation. And I guess the questions are couldn't – wouldn't that be a question for discovery in the first instance but then eventually for a jury to work out? The first question is whether or not there are plausible allegations in the two counterclaims that they created. If they took the deposition of a town official who said we would never approve this with letters like this. We'd be crazy to do this.  Once we got these letters, there was no way if they put in an application it would have got approved. Couldn't that be a deposition? I can't say that it couldn't be a deposition. All right. But it's still highly speculative. Is there evidence on either side that St. Christopher's do anything to facilitate the approvals or to cooperate with the town in evaluating the project to give the approvals? Did St. Christopher's do anything? Yeah. As far as I know, they weren't asked to. This was – the developer took the project over. These people run a facility for autistic children. Is there any evidence in the record so far or what are the allegations about whether the developer attempted to get approval? So it took the kind of steps that a developer would take in order to get approval. There's nothing in the record. There was some beginning steps taken at the very beginning with a few studies, and then everything dropped dead, completely dropped dead. And I would have expected that in an amended complaint or a counterclaim, the allegations would have been made because that's what I know I would have done, that we did this, we did that. We did this study and that study. We made this application. We got ourself on this calendar and that calendar. None of that. None of that at all. None of that happened. There's nothing in the complaint to indicate anything that happened other than there were a couple of newspaper articles, which the lawsuit was filed. It was a public document, and the local papers do pick those things up. It was a letter to the town in which we simply asked whether or not the town had suggested the larger project, and the town said we did not suggest the larger project. What about the argument that when your lawsuit was pending, there was no way the town would give an approval because they would never give an approval when there's a cloud over the contract of sale? I don't know that that's correct. We don't know either way. Certainly in my experience. Is it implausible? I don't know. I don't know. I don't know. I think towns very frequently have litigation all over the place, and they continue to proceed right along. I know one that's going up in the town of Cortland now over a drug treatment center. It's been going on for years now. There's litigation and litigation, and it's still going on, and they're still pursuing their approvals. All right. Thank you, Mr. Scherer. Thank you. Mr. Rice, you have two minutes in rebuttal. Thank you, Your Honor. First, Your Honor, so much of what has been described is based on issues of fact that really should have been committed through discovery. This case was dismissed on a motion to dismiss just based on the complaint, nor did the trial court even give the opportunity. Are there allegations in the complaint, your complaint, the counterclaim complaint, as to what you were doing in order to pursue getting approvals? Yes, and I was going to go to that in my second point. You need to look at the timeline. The counterclaim talks about that from January of 2016 to June of 2017, when the first complaint was filed by the plaintiff, and in June of 2017, we got these letters saying that we're going to file the complaint. During that period of time, according to the counterclaim and the documents, we were doing everything to basically say we think we have a valid contract, we want to move forward. We have Mr. Ford's letter that says we want to meet. That's all true. But once the complaint is filed, then the ability, or it would have been futile for us to then expend money to go through a zoning application. It's one thing to say, well, there's litigation and zoning. It's another thing to say that you don't have standing. You're not even a contract purchaser. That's certainly put an end to that. And if ultimately the trial program— We would be saying that if we would agree with that, we would be saying in a real estate, in real estate transactions, if one party thinks there's an unenforceable contract for whatever reason, fraud in the inducement, and they file a lawsuit, declaratory judgment lawsuit, then that itself, the filing of the lawsuit, because that'll potentially torpedo development, becomes an implied breach of the duty of good faith and fair doing, right? They can't file a lawsuit. Otherwise, they're subjecting themselves to that? Absolutely, because no planning board is going to expend the time. These hearings take months, if not years. The basic issue was do you have the right to bring it in the first place, or are you a contract purchaser? Your counterclaim in paragraph 77 says, St. Christopher's wrongfully instituted this action to impede, hinder, or prevent JANMA from fulfilling its contractual obligations and or developing the project. So do you believe—I mean is your allegation that St. Christopher's didn't genuinely believe that there was fraudulent inducement, but they brought the action for the purpose of preventing you from getting the approvals? The answer to that is yes. I don't believe that they were defrauded. Does your claim depend on that? So if they genuinely thought that there was fraudulent inducement and a fact finder determined that, would you lose? Again, whatever fact finder's find, I could live with. But that gives me a right to have a trial and a right to have this— No, but I guess I'm asking about the nature of the claim. So is your claim that even if they believed that there was fraudulent inducement, just by bringing such a claim, it would prevent you from getting approvals, and therefore it's a violation of the obligation of good faith and fair dealing? Or is your claim, well, they brought the litigation not because they had a genuine belief that there was fraudulent inducement, but they brought it for the purpose of preventing us from getting approvals, and that's why there's a violation of the obligation of good faith and fair dealing. I believe it's the latter. But at a minimum, once they filed the complaint and they put into question whether or not we were a valid contract purchaser or not, that effectively, in my judgment, stayed this obligation to move forward on the zoning process until that issue got resolved. Once that issue got resolved, if it was a ruling that the contract is still valid, then we'd have our obligation to perform. But we couldn't perform under that particular cloud. All right. Thank you very much. We'll reserve decision. So that completes the business of the court. The last case, United States v. Batista, is on submission. And thanks to Ms. Molina, I'll ask that she adjourn court. Court stands adjourned.